## Case No. 7,215.

### JANSEN et al. v. The THEODOR HEINRICH.

### BANG et al. v. The SAME.

[Crabbe, 226.] [1]

District Court, E. D. Pennsylvania. Nov. 9, 1838.

Mr. Kane, for libellants.

Mr. Read, for respondent.

Mr. Kane, for libellants, in conclusion.

HOPKINSON, District Judge. It seems to be admitted that the first voyage of the ship, from Riga to Liverpool, and back to Riga or some other port, was finished and ended

by the return to Riga; and that the contract made by the libellants, whether at Liverpool or at Hamburg, was fulfilled on their arrival at Riga. Both parties were then at liberty; the captain to dismiss the men, and the men to leave the ship. If, then, the captain has any claim to the further service of these men, it must be by virtue of a new agreement. We enter upon the inquiry whether any such new agreement was made, and what it was; with the preliminary remark, that it is incumbent upon the captain who claims the service, to show his title to it; to prove the contract by which he claims it. He must support his claim. It is his duty to see that the contract is clear and explicit, at least in two essential particulars, first, the description of the voyage, and, second, the rate of wages. If there is any ambiguity, uncertainty, or obscurity in it, especially in the description of the voyage, the construction most favorable to the seamen will be adopted. The instrument is prepared by the captain; the seamen sign whatever is put before them, having their eye principally on the rate of wages. They are generally ignorant, illiterate, and imprudent, and it is often necessary to protect them against themselves and their own thoughtless acts. When, therefore, the description of the voyage is not precise, but general terms are used, they will be limited by a reasonable interpretation, by the rules of natural justice, in order to save the seamen from hard and oppressive conditions, arising from a harsh construction of general terms. It is on this principle that courts of admiralty, both in England and in this country, have set a reasonable limitation upon the words "or elsewhere," in the description of a voyage. The obligations of the libellants to this ship must be collected from the proceedings at Riga, in October, 1837; and as we have written documents of what occurred there, they will be chiefly relied upon. The writing is found on a sheet attached to the original muster-roll, which is headed—"This sheet belongs to the muster-roll of the ship Theodor Heinrich. Captain J. D. Poulsen. Riga, Oct. 26, 1837." It is not easy to understand what is meant by this heading. How could this sheet belong to a former muster-roll, or contract, which was defunct, the voyage described in it ended, the contract performed, and all the parties to it—that is, the seamen—declared to be dismissed? This sheet, if it have any force as a contract, must have it as creating a new agreement, between new parties, and for a new object. We must then inquire, first, has it been so executed as to make a contract according to the regulations of Russia? and, second, to what does it bind these men?

The Russian Code expressly requires that these contracts shall be signed by the mariners, in the presence of witnesses. As regards the Russian seamen on board the ship, this was done, at least so far as to have their signatures in the presence of one witness; but as to the libellants, they signed nothing, were required to sign nothing, on the contrary, they were told by the harbor master that he had nothing to do with them, as they were not Russians. Their names were put down by somebody else, although they could write; but by whom this was done, or by what authority, we do not know; the libellants never assented to it, or even knew that it was done. A usage has been conjectured, but there is no evidence of it; and we can hardly believe that, under such a government as that of Russia, a harbor master has authority to dispense with the law, and substitute his own act for the signatures of the seamen, and the attestation of witnesses. But if we should grant that the names of these men were put down on the muster-roll by their own consent, or even by their own hands, what do we gain by it? Our only question is, what did the men undertake to perform? We look in vain to the second sheet for the answer. No voyage is there described, either in precise or general terms. It is declared that "This sheet of paper belongs to the muster-roll of the ship Theodor Heinrich, Captain J. D. Poulsen. Riga, Oct. 26, 1837. In consequence whereof the following constitutes the roll of equipage of the ship Theodor Heinrich. Berent." Then follows a list containing the names of the crew. It goes on thus: "After dismission of the former crew, were engaged:" and then we have a list with the same names as before; but not the least allusion to the voyage to be performed. Nothing but the names and rate of wages. The names of the four Russian sailors, or their marks, are written by their own hands. The libellants did not sign. At Constantinople, the legation of Russia at that port certify the roll, and insert the names of the libellants on it several months after they had shipped. This certificate has no binding force on these men; it is not probable that they ever saw or heard of it. If it was otherwise, what does it certify as to the voyage? That the ship was "bound to Philadelphia;" thus making Philadelphia the terminus of the voyage. To get over this difficulty, it is alleged by the respondent that this second sheet, declared to belong to the first muster-roll, was a renewal, or readoption, of the original contract, as found in that muster-roll. How will this serve the respondent, in the only object of our inquiry, the description of the voyage for which the libellants bound themselves, and from which service it is now alleged they absconded or deserted, in violation of their contract? Let us grant that they did adopt, or renew, the original contract. What was it? "To sail for Liverpool, and thence back again to Riga, or some other port for which freight might be obtained." Here is a clear, explicit, and lawful description of the voyage. Perfectly reasonable, and easy to be understood. Will

-the respondent contend that this was the voyage of the second contract? Was it so explained to these men? Did they ever know what were the terms of that original contract? There is no evidence of any such thing. Did the captain so understand it? If he did, he has been in the gross and continued violation of his contract. On an agreement for a voyage from Riga to Liverpool, and back to Riga, or to some other port, what has he done? He has never gone to Liverpool at all, which was the first port of his destination, but he has taken these men to Londonderry, to Belfast, to Thoone, to Constantinople, to Odessa, back to Constantinople, to Philadelphia; and now claims the right to take them to Richmond, to Rotterdam, and wherever further he may find it convenient or profitable. And all this is to be done under a contract for a voyage from Riga to Liverpool, and back again! Having no evidence, either such as is required by the Russian law, or even by parol, of the character of this contract in relation to the voyage to be performed, but merely the fact that these men did enter into the service of the ship, at certain stipulated wages, what shall we believe was the contract, judging from the acts of the parties, and what will the law imply from those acts? The libellants went on board the ship at Riga; their monthly wages were fixed; they sailed for Londonderry without objection or complaint. Must we not say that they agreed to that voyage? I cannot doubt it. They received wages for that service. They might there have left the vessel, as there was nothing to bind them to her. The same observation applies to the voyages to Belfast, to Scotland, to Constantinople, to Odessa, to Philadelphia. They were at liberty to terminate the connexion with the ship, at any of these places; or to continue in the service, and receive the stipulated compensation. Both parties were equally at liberty at these points. But when the ship sailed from Constantinople, for Philadelphia, I consider that the obligation was mutual to continue their contract until their arrival at Philadelphia. It was an implied contract. The seamen could not have left the ship, to go on board of another, on the broad ocean; nor could the captain have so dismissed them; nor at any intermediate port, for, when they sailed for Philadelphia, they agreed to go to Philadelphia. This is my construction of the implied contract, or understanding, between the parties, drawn from their acts; and this contract is the only one we have to resort to.

Upon this view of the case, the libellants, on the arrival of the ship at Philadelphia, were no longer bound to continue with her; but, if the next voyage proposed was disagreeable to them, they might terminate their engagement here. This, however, will not acquit them of the duty of obedience they owed to the ship and her master, while at Philadelphia, such as they would have owed, if Philadelphia had been the terminus of the voyage, by regular written articles of agreement. What are the facts on this part of the case? On the 16th October, the ship not being then discharged, these men left the ship, without leave. The ship did not complete her unloading for three days after. It is said, first, that this is a forfeiture of the wages, and second, that, at least, they are liable for damages. As to the first, I have explained my views of the law in Magee v. The Moss [Case No. 8,944]. I think the principles I adopted in that case are applicable to this, and that there is no ground for forfeiture. As to the question of damages. By the general maritime law, as well as by the Russian maritime code, seamen are answerable for any damage sustained by, or because of a violation of, their duty. Where the precise damage can be proved, that will be the measure of damages; when it cannot, the court must make the assessment, according to the circumstances of the case. The libellants left this vessel before she was discharged of her cargo. They did so suddenly, without any notice of such an intention. They did so, it is true, under the belief that they had a right so to do; and I have given them credit for this belief in refusing the prayer for a forfeiture of their wages. As I have said, we have no specific evidence of damage, but it is not possible that four or five able-bodied seamen—more than half of the whole crew—could have left the ship, at such a time, without loss and inconvenience, which has been followed up by expenses and delays. If the libellants had made out a clear right for leaving the ship, at the time and in the manner they did, they certainly would not have been responsible for these consequences. But, although their absenting themselves was not an aggravated desertion of duty, there was enough of wrong in it to entitle the captain to some redress. In estimating it, I can not put out of the case that these men have no cause of complaint on board; they have been sailing in the vessel for more than a year, without the least complaint against the master or his officers, from any one of them. Nor can I hesitate to believe that, although the captain did not secure himself for their services until the return of the ship to her home, yet that he honestly believed they would remain with him. Such, I doubt not, was his expectation, but it does not make a contract. The conduct of these men, in continuing in the ship, without a word of discontent, or an intimation of any intention or desire to leave her, until their arrival at Philadelphia, warrants me also in the belief, that it was their expectation and intention to return to Russia in the ship. They hardly expected either to be discharged, or to quit the vessel, at a port so distant from their own home, among a strange people, whose language was unknown to them. In the absence of any ill treatment in the ship, I must look for a mo-

tive for quitting her, and I find it in the information they must have received, that the wages given to seamen here are much higher than they are earning. Imputing this motive to them, I shall be more liberal in my estimate of compensation to the ship, than I would have been under other circumstances. The increase of wages they will get, will enable them, without any hardship, to meet a liberal compensation to the captain, for his losses and difficulties arising from their leaving his service.

Decree. That the contract between the libellants and the master terminated with the arrival of the ship at Philadelphia, and the discharge of her cargo, and that the master has no lawful claim upon their service after that time; that $20 be deducted from the amount appearing to be due to each libellant respectively; and that the suits be consolidated and single costs, only, taxed and allowed.